UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

XPO CNW, INC., et. al.,

    Plaintiffs,

v.                                      Case No. 16-10391

R+L CARRIERS, INC., et. al.,

    Defendants.
_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**

Now before the court is a Motion for Partial Judgment on the Pleadings brought by Defendant R+L Carriers, Inc. ("R+L"). (Dkt. # 14.) The motion has been fully briefed and the court concludes that a hearing is unnecessary. *See* E.D. LR 7.1(f)(2). For the reasons stated below, the court will grant Defendant's Motion.

**I. BACKGROUND**

On October 30, 2015, Plaintiff XPO Logistics, Inc. ("XPO") acquired Con-way, Inc., a family of companies that included Con-way Freight. (Dkt. # 1, Pg. ID 6.) This case arises out of the efforts of Defendant R+L, a Con-way competitor, to recruit and hire employees of Con-way who were laid off or at risk of being laid off following the acquisition.

While the exact timing is disputed, all parties agree that within two days of the acquisition, R+L launched a website targeting Con-way's employees: "www.conwaylayoff.com." (Dkt. # 1, Pg. ID 6; Dkt. # 14, Pg. ID 215.) The website included the following statement:

> Were you laid off from Con-way? Don't worry about the XPO Logistics acquisition, when one door closes another opens. R+L Carriers is hiring today. . . . Turn your valuable years of knowledge and experience into a new career with R+L Carriers, which was named a Top National/Multiregional LRL Carrier in Logistics Management magazine's 2015 Quest for Quality Awards. R+L Carriers launched Conwaylayoff.com to inform those employees that may have been affected by the recent acquisition of Con-way Freight, of similar opportunities that we have where they may be able to put their skills to work.

(Dkt. # 1-7, Pg. ID 48-49.)

On November 3, 2015, R+L issued a press release announcing the launch of the website, warning that "[w]hile no layoffs were officially announced [by Con-way], during negotiations, XPO management was clear it would eliminate redundancies and look for other ways to 'leverage' divisions of the combined companies." (Dkt. # 1-2, Pg. ID 31.) *Truckers News*, a national publication for freight employees, then ran a story about the website, quoting portions of R+L's press release. The very next day, "Plaintiffs sent Defendant R&L [sic] a letter demanding Defendant remove the Website and cease and desist all raiding, targeting and other solicitation of Plaintiffs' employees through unlawful means or for unlawful purposes." (Dkt. # 1, Pg. ID 7; *see also,* Dkt. # 14.) R+L complied, removing the website on November 6, 2015. (Dkt. # 1, Pg. ID 12.)

Plaintiffs then brought this action, alleging among other things, that the website unlawfully used Plaintiffs' registered trademarks "CON-WAY" (Registration No. 2,278,192) and "CON-WAY FREIGHT" (Registration No. 4,286,252) in violation of the Lanham Act and that the domain name "www.conwaylayoff.com" constituted a violation of the Anti-Cybersquatting Consumer Protection Act. (Dkt. # 1.) In response, R+L filed the current Motion. (Dkt. # 14.)

## II. STANDARD

Motions under 12(c) are adjudicated under the same legal standard as those under Rule 12(b)(6). *Lindsay v. Yates*, 498 F.3d 434, 437 n.5 (6th Cir. 2007). Under Rule 12(b)(6), the court may dismiss a complaint if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Rule 12(b)(6) "'allow[s] a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything in the alleged complaint is true.'" *Bagsby v. Gehres*, 225 F. App'x 337, 355 (6th Cir. 2007) (quoting *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir.1993)). Accordingly, the court must view the complaint in "the light most favorable to plaintiffs" by accepting all the allegations in it as true while drawing "all reasonable inferences . . . in favor of plaintiffs." *Rondigo*, 641 F.3d at 680 (citing *Bassett*, 528 F.3d at 430). "However, 'a legal conclusion couched as a factual allegation' need not be accepted as true." *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

In order to "provide the grounds of [their] claimed entitlement to relief," Plaintiffs must offer "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Rather, Plaintiffs' complaint needs to include "'enough factual matter' that, when taken as true, 'state[s] a claim to relief that is plausible on its face.'" *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 280 (6th Cir. 2010) (quoting *Twombly*, 550 U.S. at 556, 570) (alteration in original). "Plausibility requires showing more than the 'sheer possibility' of relief but less than a 'probab[le]' entitlement to relief." *Fabian*, 628 F.3d at 280 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (alteration in original). Pleading "facts that are 'merely consistent with' a defendant's liability" is not enough to cross the "'line between possibility and

plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). A complaint can only survive a motion to dismiss if it has "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 570). Ultimately, "determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## III. DISCUSSION

While Plaintiffs have alleged a number of both federal and state claims against various Defendants, R+L seeks summary dismissal of just two: Count I—Trademark Infringement and Count II—Violation of the Anti-Cybersquatting Consumer Protection Act ("ACPA"). (Dkt ## 1, 14.) Both causes of action will be addressed in turn.

### A. Trademark Infringement

First, Plaintiff's Complaint asserts a cause of action for trademark infringement under the Lanham Act. The Lanham Act provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

"The Lanham Act is constitutional because it only regulates commercial speech, which is entitled to reduced protections under the First Amendment." *Taubman Co. v. Webfeats,* 319 F.3d 770, 774 (6th Cir. 2003) (citing *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980)). The Sixth Circuit has therefore held that the first inquiry under the Lanham Act is whether the defendant's "use is commercial and therefore within the jurisdiction of the Lanham Act, worthy of lesser First Amendment protections." *Id.* If the defendant's use "is commercial, then, and only then, do we analyze his use for a likelihood of confusion. If [the defendant's] use is also confusing, then it is misleading commercial speech, and outside the First Amendment." *Id.* at 774-75. "Hence, as per the language of the Lanham Act, any expression embodying the use of a mark not 'in connection with the sale . . . or advertising of any goods or services,' and not likely to cause confusion, is outside the jurisdiction of the Lanham Act and necessarily protected by the First Amendment." *Id.* at 775; *see also Bosley Medical Institute, Inc. v. Kremer*, 403 F.3d 672, 676-77 (9th Cir. 2005) ("The Supreme Court has made it clear that trademark infringement law

5

prevents only unauthorized uses of a trademark in connection with a commercial transaction in which the trademark is being used to confuse potential consumers.").

R+L advances several independent theories to argue that it is entitled to judgment on the pleadings with respect to this claim: (1) "R+L did not use the Con-way marks in commerce" (Dkt. # 14, Pg. ID 219 (emphasis omitted); (2) "R+L used the Con-way marks in a non-trademark way" (*Id.* at Pg. ID 221 (emphasis omitted); and (3) "R+L use of the Con-way marks was a protected fair use" (*Id.* at Pg. ID 223). The court need address only the first two.

### 1. Commercial Use

For purposes of the Lanham Act, Congress has defined the term "in commerce" to mean "in connection with the sale, offering for sale, distribution, or advertising of any goods or services." 15 U.S.C. § 114(1); *see also Taubman Co.,* 319 F.3d at 774. The Sixth Circuit has held that this is a "strict liability" test and that the subjective intent of the infringing party is irrelevant. *Taubman,* 319 F.3d at 775. Even "extremely minimal" commercial activity, such as providing a link to a third-party website that sells goods, can trigger liability. *Id.*

Defendants claim that "Plaintiffs do not and cannot plead that the Website sells, distributes or advertises any goods or services, or that the Website provided links that sold, distributed or advertised goods or services." (Dkt. # 14, Pg. ID 220). The court is unpersuaded. While the bulk of the website does focus on recruiting potential employees, it is undisputed that it also contained the following descriptive paragraph:

6

> Today, R+L Carriers serves all 50 states, Canada, Puerto Rico, the Dominican Republic, and much of the Caribbean. The company offers LTL, Truckload, Business Critical, Logistics and more. To learn about R+L Carrier's *Worldwide shipping solutions* visit rlc.com.

(Dkt. # 1-7, Pg. ID 50.) Plaintiffs argue that this description constitutes an "advertisement[] for R+L's services." (Dkt. # 21, Pg. ID 283.) The court agrees. The invitation to visit R+L's commercial website alone is enough to clear the "extremely minimal" bar set by the Sixth Circuit with respect to commercial activity. *Taubman,* 319 F.3d at 775.

### 2. Risk of Confusion

Having concluded that R+L used Plaintiffs' registered trademarks "in connection with the . . . advertising of . . . services," the court must determine whether such use of the disputed mark "is likely to cause confusion" among consumers "as to the origin . . . of [R+L's] services." 15 U.S.C. § 114(1). This is "[t]he touchstone of liability [for trademark infringement.]" *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 610 (6th Cir. 1997). As a threshold question, courts ask whether the defendants "are using the challenged mark in a way that identifies the source of their [services]." *Interactive Products Corp. v. a2z Mobile Office Solns., Inc.,* 326 F.3d 687, 695 (6th Cir. 2003). "If they are not, then the mark is being used in a 'non-trademark way' and trademark infringement laws . . . do not apply." *Hensley*, 579 F.3d at 610.

While Plaintiffs allege that "Con-way's trademarks as used by Defendant R&L [sic] . . . so resemble Plaintiffs' marks, as to be likely to induce the belief, contrary to fact, that the marks appearing on the Website were genuine and used with the sponsorship, license and/or approval of Plaintiffs" (Dkt. # 1, Pg. ID), the screen shot of

7

the website attached to Plaintiffs' own Complaint contradicts this claim, (Dkt. # 1-7). The website clearly states that "*R+L Carriers*"—not Con-way, Con-way Freights, or XPO—"launched Conwaylayoff.com to inform those employees that may have been affected by the recent acquisition of Con-way Freight, of similar opportunities that we have where they may be able to put their skills to work." (*Id.* at Pg. ID 48-49 (emphasis added).) From this context, it is clear that Defendants actually did the exact opposite of that which is prohibited by law: it used the disputed marks to distinguish itself and its services from those of Plaintiffs, not confuse them. In this respect, the case is not unlike *Dow Corning Corp. V. Xiao,* No. 11-10008, 2011 WL 2015517, at *8 (E.D. Mich. May 20, 2011) (Ludington, J.), where the court found that a defendant's use of a competitor's trademarked name to compare plaintiffs' products with their own constituted a non-trademark use of that mark that could not create confusion. *See also Kassa v. Detroit Metro Convention & Visitors Bureau,* 150 F. Supp 831, 839 (E.D. Mich. 2015) (Leitman, J.) ("Binding [Sixth Circuit case law] makes clear that where, as here, a plaintiff's own allegations show that a defendant used a mark in a non-trademark way, the plaintiff cannot establish a likelihood of confusion, and his federal trademark infringement claim should be dismissed.").

The court will grant R+L's Motion on this basis.

### C. Cybersquatting

The ACPA provides, in relevant part:

(1)(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person

> (i) has a bad faith intent to profit from that mark . . . and

> (ii) registers, traffics in, or uses a domain name that--

>(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark; [or]
>
>(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; . . .

15 U.S.C. § 1125(d)(1)(A).

In order to establish a "cybersquatting" claim under the ACPA, Plaintiff must establish: (1) it has a valid trademark entitled to protection; (2) its mark is distinctive or famous; (3) Defendants' Domain Names are identical or confusingly similar to, or in the case of famous marks, dilutive of, Plaintiff's mark; and (4) Defendants used, registered, or trafficked in the domain name (5) with a bad faith intent to profit. *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 204 (6th Cir. 2004) (citing *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 546 (6th Cir. 2003)). Here, Plaintiff's case fails because it has provided no evidence that Defendants used the Domain Names with a bad faith intent to profit.

The ACPA lists several factors a court may consider in determining whether a person has a bad faith intent, including:

>(I) the trademark or other intellectual property rights of the person, if any, in the domain name;
>
>(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
>(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
>(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
>
>(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
>
>(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
>
>(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the

9

> person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
>
> (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
>
> (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B). Courts "are not limited to considering just the listed factors when making [the] determination of whether the statutory criterion has been met. The factors are, instead, expressly described as indicia that 'may' be considered along with other facts." *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 498 (2d Cir. 2000) (citing 15 U.S.C. § 1125(d)(1)(B)(i)). "The role of the reviewing court is not simply to add factors and place them in particular categories, without making some sense of what motivates the conduct at issue. The factors are given to courts as a guide, not as a substitute for careful thinking about whether the conduct at issue is motivated by a bad faith intent to profit." *Lucas Nursery and Landscaping, Inc. v. Grosse,* 359 F.3d 806, 811 (6th Cir. 2004).

In *Lucas Nursery*, the defendant, who was dissatisfied with the services provided by the plaintiff's landscaping business, registered the domain name "lucasnursery.com" to complain about the plaintiff's company. The Sixth Circuit balanced the relevant "bad faith intent" factors listed above and found:

> None of these factors militates against Grosse. There is no dispute that Lucas Nursery did not have an online location, and hence Grosse's creation of a web site to complain about Lucas Nursery's services could not have been intended "to divert consumers from the mark owners's online location." Nor is there any evidence that Grosse ever sought to

10

> mislead consumers with regard to the site's sponsorship. The web site explicitly stated that the site was established by Grosse for the purposes of relaying her experience with Lucas Nursery. Moreover, Grosse never offered to sell the site to Lucas Nursery. She also did not provide misleading contact information when she registered the domain name. Finally, she has not acquired any additional domain names, which would be indicative of either an intent to sell such names to those entities whose trademarks were identical or similar, or exploit them for other uses.

*Id.* at 810.

Here, it is undisputed that R+L set up a website and used Plaintiffs' trademark in the domain name. But, as in *Lucas Nursery,* this alone is insufficient to establish that R+L operated in bad faith. Plaintiffs have not alleged that R+L ever offered to sell "www.conwaylayoff.com" to Plaintiffs, nor have they alleged that R+L has acquired other suspect domain names. Instead, Plaintiffs offer the court a bare bones recital of the statutory language, stating that (1) "Defendant R&L [sic] has registered and has used "www.conwaylayoff.com" without Plaintiffs' authorization and with bad faith to profit from Plaintiffs' trademark" and (2) that the "infringing domain name . . . directed or redirected to an authorized website controlled by Defendant R&L [sic], which profited from its use." (Dkt. # 1, Pg. ID 13-14.) This is insufficient to survive the *Twombly* standard. Because Plaintiffs have failed to adequately plead bad faith, the court will grant R+L's Motion with respect to the ACPA claim, as well.

11

### III. CONCLUSION

IT IS ORDERED that Defendant R+L's Motion for Partial Judgment on the Pleadings (Dkt. # 14) is GRANTED.

          s/Robert H. Cleland
          ROBERT H. CLELAND
          UNITED STATES DISTRICT JUDGE

Dated:  September 14, 2016

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, September 14, 2016, by electronic and/or ordinary mail.

          s/Lisa Wagner
          Case Manager and Deputy Clerk
          (313) 234-5522